morals." Cal. Civil Code §1667. An illegal contract is void and cannot be ratified by any

subsequent act. *Black Hills Investments, Inc. v. Albertson's, Inc.* (2007) 146 Cal. App. 4th 883,

896. The issue of whether a contract is legal or contrary to public policy is one of law. *Jackson*

*v. Rogers & Wells* (1989) 210 Cal. App. 3d 336, 350.

218.    As noted above, the subject contract which the Defendants seek to enforce is alleged to

be illegal based on a violation of numerous California statutes, including, but not limited to:

Financial Code §50204 and Civil Code §§1709 and 1710. Such violations void the contract as

each of the statutes so violated relate directly with the formation of a valid contract.

219.    Public Policy: A court may decline to enforce a contract on policy grounds expressed or

implied in a statute. *Cariveau v. Halferty* (2000) 83 Cal. App. 4th 126, 132. A finding that a

contract or contract term violates public policy usually results in the contract being declared void

and a court will not enforce it. *Armendariz v. Foundation Health Psychcare Servs., Inc.* (2000)

24 Cal. 4th 83, 99.

220.    California has declared expressly that the preservation of home ownership is a vital state

interest and that any conduct which serves to threaten home ownership is against the public

policy of this state. California Civil Code §1695(b), Health and Safety Code §50001(a) and Civil

Code §2923.5. Plaintiff allege that the loan agreements here violate California public policy, as

it has set the Plaintiff up for certain default based on their objective inability to afford the

monthly payments, which would inevitably result in foreclosure of the home, rather than the

preservation of the real property.

221.    Unconscionability: Commentary to §208 of the Restatement (Second) of Contracts states

as follows: "…gross inequality of bargaining power, together with terms unreasonably favorable

to the stronger party, may confirm indications that the transaction involved elements of deception

or compulsion, or may show that the weaker party had no meaningful choice, no real alternative, or did not in fact assent or appear to assent to the unfair terms. Factors which may contribute to a finding of unconscionability in the bargaining process include the following: belief by the stronger party that there is no reasonable probability that the weaker party will fully perform the contract; knowledge of the stronger party that the weaker party will be unable to receive substantial benefits from the contract; knowledge of the stronger party that the weaker party is unable reasonably to protect his interests by reason of physical or mental infirmities, ignorance, illiteracy or inability to understand the language of the agreement or similar factors." Like illegality and public policy claims, the issue of unconscionability is a question of law. *Flores v. Transamerica HomeFirst, Inc.* (2001) 93 Cal. App. 4th 846, 851.

222.   Here, Defendants were of a stronger bargaining position, created a contract of adhesion, and knew that the Plaintiff would not be able to afford the mortgage payments on the loan, as the payments at the adjustment period exceeded Plaintiff's ability to pay. Defendants also knew that the Plaintiff was certain to default, even advising Plaintiff to default, and yet breached its statutory duty to properly and fairly underwrite the loan before funding it and, thereby, set the Plaintiff up for certain default resulting in the loss of equity and the ruination of credit. Such conduct is shocking and unconscionable, as the Defendants unfairly and unreasonably profited from their failure to disclose material terms of the contract and from the inability of Plaintiff to understand the terms due to their very limited understanding of the contract language.

### SIXTH CAUSE OF ACTION:
### VIOLATION OF CALIFORNIA BUSINESS AND PROFESSIONS CODE §17200
### (AS AGAINST ALL DEFENDANTS)

223.   Plaintiff re-alleges and incorporates the allegations contained in the preceding paragraphs of this Complaint as though fully set forth herein.

224.    Plaintiff alleges that Defendants engaged in unlawful, unfair or fraudulent business acts or practices and unfair, deceptive, untrue or misleading advertising in violation of California Business and Professions Code §17200 and the Unfair and Deceptive Acts and Practices statutes.

225.    Defendants were doing business in the State of California, by marketing and selling mortgages and refinanced mortgages on a mass scale to the public for profit, and therefore are precisely the type of businesses that Business & Professions Code §17200 governs. The fraudulent inducement to incur debt and the fraudulent misrepresentation of that debt are precisely the fraudulent, deceptive, and unfair business practices that the Business & Professions Code §17200 addresses.

226.    Plaintiff alleges that Defendants engaged in deceptive business practices as defined in the Code Section above and in Section 17500, by marketing and funding predatory loans that not only increased the payments over time, but also obligated the Plaintiff to make payments well beyond what the Plaintiff potentially could afford.

227.    Based on information and belief, Plaintiff alleges that all Defendants engaged in deceptive business practices as defined in California Business & Professions Code §§ 17200, et seq. and 17500, et seq. by: 1) making untrue or misleading statements regarding the value of the Plaintiff's property; 2) concealing the predatory nature of the loan; and 3) creating large post-adjustment increases in monthly payments to an amount that far exceeded the Plaintiff's reasonable ability to pay. Plaintiff alleges that these acts and omissions were all designed to, and in fact did, set the Plaintiff up for certain default so that the Defendants could charge exorbitant processing and late fees and eventually recover the property through foreclosure.

228.    Plaintiff further alleges that Defendants engaged in deceptive business practices by fraudulently recommending, offering, marketing, accepting, purchasing and/or collecting on a

debt/mortgage that they each knew, or should have known, was void due to the illegal nature of the contract and that could cause default before termination of the loan term and, was therefore, unconscionable.

229.   Plaintiff alleges that Defendants engaged in deceptive business practices by attempting to collect on a debt that was void and unenforceable, and by denying Plaintiff the benefits of the loan agreement and the benefits of the Federal programs designed to prevent foreclosure without good cause and with bad faith intent.

230.   The acts of the Defendants constitute unfair business practices and/or acts, as defined in California Business and Professions Code §§17200 and 17500, as the acts were in violation of California statutory law, Civil Code §§1667 (as the acts were illegal, i.e., failure to properly qualify, in violation of Cal. Fin. Code §4973), Civil Code §1708 (as the acts were injurious to the Plaintiff and to the public at large, in that they were designed to cause a certain or likely default), Civil Code §1709 (as the Plaintiff were willfully induced to change her financial position to her detriment, i.e., from a payment that she could afford, to one that she could not), Civil Code §1710 (as the Plaintiff was deceived by the suppression of her ability to afford the loans throughout its term), Civil Code §1770(a)(19), (as the loan agreement contained unconscionable terms, such as the exceedingly high interest rates), Cal. Fin. Code §§4973, et seq. and 50204 (as the Defendants failed to properly qualify the Plaintiff for the loan payments and set her up for certain or likely default) and were also in violation of established California public policies to promote and preserve home ownership and to prevent foreclosures. Civ. Code §§1695(b), 2923.5 and 3412.

231.   Plaintiff further alleges that the acts of the Defendants were intentional and malicious, as they knew or should have known that the loan agreement was in violation of numerous

California Statutes, including Cal. Fin. Code §§4973 and 50204 and various sections of the Cal. Civ. Code, including §§1667, 1689(b), 1708, 1709, 1710 and 1770(a)(19), and were also in violation of established California public policies to promote and preserve home ownership and to prevent foreclosures (Civ. Code §§1695(b), 2923.5 and 3412).

232.   Plaintiff is informed, believes, and thereupon alleges that Defendants, and each of them, furthered the above deceptive and deceitful corporate polices by fraudulently underwriting "stated income" loans with full knowledge of the false (and unlikely) statements of income and assets, by willfully deceiving Plaintiff regarding the true (appraisal) value of her property, and by deceiving Plaintiff about the true (predatory) nature of her loan and her own inability to pay the loan (known at all times to the Defendants).  Plaintiff alleges that for these reasons Defendants were in violation of California's Unfair Business Practices code sections above.

233.   Plaintiff is informed, believes, and thereupon alleges that Defendants perpetrated their fraudulent scheme of selling off overpriced loans by making willful and inaccurate credit disclosures regarding Defendants' borrowers, including Plaintiff's credit, to third parties. Plaintiff alleges that this false credit disclosure was critical to the success of Defendants' continued sales of the massive pools of mortgage loans necessary to perpetuate their scheme. Plaintiff alleges that Defendants were aware that if the true credit profiles of the borrowers and the values of their real estate were accurately disclosed, the massive fraudulent scheme would end.  Plaintiff alleges that as a result, the Defendants repeated, reinforced, and embellished their false disclosures.

234.   Plaintiff is informed, believes, and thereupon alleges that Defendants' fraudulent scheme includes the pervasive dissemination of false credit disclosures to third parties (including purchasers of bundled mortgage pools created by the Defendants) whereby false credit reports

created for Plaintiff, and pervasive false disclosures of these false credit reports, permitted Defendants to continue their scheme and victimize the Plaintiff.

235.    Plaintiff is informed, believes, and thereupon alleges that Defendants' pervasive false disclosures also had a deleterious effect on the housing market as the false information became known and the market for the sale of bundled loans evaporated.  Plaintiff alleges that because of this she lost the equity investments made in her home under the weight of *deflation* rather than *inflation* and property values that *depreciated* rather than *appreciated* while Defendants adjusted to the depreciating values by aggressively foreclosing.  Plaintiff alleges that Defendants, and others like them, caused a drop in property values.

236.    Plaintiff is informed, believes, and thereupon alleges that the forgoing violations were in furtherance of the fraud perpetrated on Plaintiff.  Plaintiff alleges that Defendants could not have told the truth in their public filings without that truth becoming known to Plaintiff.  Plaintiff alleges that, conversely, the false filings gave additional credence and support to omissions, concealment, promises and inducements by Defendants.

237.    Plaintiff is informed, believes, and thereupon alleges that the actions described herein are unfair and patently fraudulent in that they were conducted for the sole purpose of perpetuating an unlawful and insupportable investment scheme.

238.    Plaintiff is informed, believes, and thereupon alleges that as a result of the actions, concealment and deceit described herein, Plaintiff has suffered material financial injury in fact, including loss of equity in her property, costs and expenses related to protecting herself, reduced credit score, unavailability of credit, increased costs of credit, reduced availability of goods and services tied to credit ratings, increased costs of those services, as well as fees and costs, including, without limitation, attorneys' fees and costs and damages for the inability to get credit.

COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF                                                Page 43

239. Plaintiff alleges that the acts of the Defendants were also oppressive and substantially injurious to consumers, such as the Plaintiff, in that they were committed with the intent and/or knowledge that the commission of the acts would result in the certain default of the subject loan and the forfeiture of the Plaintiff's property and equity. The acts of Defendants in furtherance of their fraudulent and deceitful corporate polices, in willfully deceiving the Plaintiff regarding their right to be considered for a modification or voluntary reformation of the illegal loan or similar internal modification program, were in violation of this Code section, as misleading and injurious to the Plaintiff.

240. Plaintiff is informed, believes, and thereon alleges that the Defendants, and each of them, as part of their business practices, fraudulently and knowingly procured or offered false or fraudulently prepared documents to fabricate the missing gaps in the chain of title or to falsely demonstrate compliance with the California Codes and Regulations related to non-judicial foreclosure and allowed these documents to be filed, registered, or recorded in California in violation of California Penal Code §115.5. The members of the public are likely to be deceived by these unlawful, oppressive and fraudulent business practices.

241. As a direct and proximate cause of the acts of the named Defendants, and each of them, Plaintiff has suffered by struggling to pay a loan that she could never afford and by the stress of becoming delinquent on her mortgage. They have also suffered consequential damages in an amount to be fully determined at time of trial, including the ruination of their credit rating. Plaintiff is also entitled to all statutory damages as provided in the above entitled Code Section.

242. Defendants' actions in implementing, perpetrating and then extending their fraudulent scheme of inducing Plaintiff to purchase mortgages for which she was not qualified based on inflated property valuations, undisclosed disregard of their own underwriting standards and the

sale of overpriced collateralized mortgages violates numerous federal and state statutes and common law protections enacted for consumer protection, privacy, trade disclosure and fair trade and commerce.

243. Plaintiff is informed, believes, and thereupon allege that as a result of Defendants' unfair competition, Plaintiff is entitled to restitution for all sums received by Defendants with respect to Defendants' unlawful, unfair and fraudulent conduct, including, without limitation, interest payments made by Plaintiff to Defendants, fees paid by Plaintiff to Defendants, premiums Defendants received when Defendants sold Plaintiff's loan into the securitized Trust and monies received from government agencies for "losses" incurred by Defendants.

244. Plaintiff is entitled to such equitable relief as is set forth in this Cause of Action and such further relief as is set forth below in the section captioned Prayer for Relief which is by this reference incorporated herein as though fully set forth at length

245. Plaintiff alleges that she is also entitled to the issuance of a Temporary Restraining Order, a Preliminary Injunction, and a Permanent Injunction restraining and enjoining Defendants from any further concealment with respect to the sale of Notes and mortgages, or from any further acts of misconduct of the kind alleged herein.

246. Plaintiff is entitled to such equitable relief as is set forth in this Cause of Action and such further relief as is set forth below in the section captioned Prayer for Relief, which is by this reference incorporated herein as though fully set forth at length.

### SEVENTH CAUSE OF ACTION:
### VIOLATION OF THE COVENANT OF GOOD FAITH AND FAIR DEALING
### (AS AGAINST ALL DEFENDANTS)

247. Plaintiff re-alleges and incorporates the allegations contained in the preceding paragraphs of this Complaint as though fully set forth herein.

248.    "Every contract includes an implied covenant of good faith and fair dealing that neither party will do anything that will have the effect of impairing, destroying, or injuring the rights of the other party to receive the fruits and benefits of their agreement.  A party who has discretionary authority has a duty to exercise that discretion in good faith and within the standards of fair dealing.  This covenant is included within any loan agreement between a lender and a borrower (citing to *Wyatt v. Union Mortgage Co.* 24 Cal.3d 773, 783)." Miller & Starr, California Real Estate 3d., *Lenders' Liability* §36:17, pp. 24-25.  The loan that Defendants originated and sought to enforce, even though said loan was void *ab initio*, imposed on each of them implied obligations to act in good faith toward the Plaintiff in carrying out the purpose and intent of the contractual agreements, including the enforcement of said agreements.

249.    Plaintiff alleges that Defendants breached those implied contractual obligations by denying the Plaintiff the benefits of the loan contract, by setting the Plaintiff up for certain default, and by ratifying predatory lending practices, facilitating fraud by accepting a loan based on a falsified loan application and by falsely inducing the Plaintiff to believe that she was qualified for a loan that she could afford, when in fact, Defendants and their agents knew all along that Plaintiff could not afford the payments over the term of the loan, and would certainly default.

250.    Plaintiff alleges that Defendants induced Plaintiff to believe that a modification was an alternative to foreclosure at the same time that Defendants were reporting Plaintiff's default to credit agencies and proceeding with foreclosure, in violation of the "dual-tracking" laws. Plaintiff alleges that Defendants made the promise of loan modification without intending to modify Plaintiff's loan, but to enhance their own position regarding foreclosure, secure an unfair advantage over Plaintiff, and proceed to foreclose and take Plaintiff's property for profit.

251.    Defendants further breached the implied covenant by enforcing a contract that they knew, or should have known, was illegal and unconscionable, given the unlawful terms and conditions contained in the loan agreements.

252.    As a direct and proximate cause of the breach of the covenant of good faith and fair dealing, Plaintiff has and will suffer economic damages in an amount to be determined at time of trial.

253.    Plaintiff alleges that Defendants intentionally induced Plaintiff to rely on Defendants; Plaintiff justifiably relied on Defendants' promises, thereby causing unconscionable injury to Plaintiff and unjust enrichment to Defendants.

## JURY DEMAND

Now comes the Plaintiff, through their attorneys, and hereby demand a trial by jury.

## PRAYER FOR RELIEF

SECOND, SIXTH, AND SEVENTH CAUSE OF ACTION

1. For Compensatory Damages in an amount to be determined by proof at trial;
2. For Special Damages in an amount to be determined by proof at trial;
3. For General Damages in an amount to be determined by proof at trial;
4. For Punitive Damages as allowed by law;
5. For Restitution as allowed by law;
6. For attorney's fees and costs of this action;
7. For Declaratory Relief, including, but not limited to, the following Decrees of this Court, that:

   a. Plaintiff are the prevailing party;
   b. The Trustee has no enforceable secured or unsecured claim against the property;
   c. The Servicer has no enforceable secured or unsecured claim against the Property;
   d. The Mortgage Originator has no enforceable secured or unsecured claim against the property.

FIRST AND THIRD CAUSE OF ACTION

1. For Compensatory Damages in an amount to be determined by proof at trial;

2. For Special Damages in an amount to be determined by proof at trial;

3. For General Damages in an amount to be determined by proof at trial;

4. For Punitive Damages as allowed by law;

5. For Restitution as allowed by law;

FOR FOURTH AND FIFTH CAUSE OF ACTION

1. Cancellation of Plaintiff' Deed of Trust;

2. Declaratory Relief, including, but not limited to the following Decrees of this Court that:

    a. Plaintiff are the prevailing party;

    b. The Trustee has no enforceable secured or unsecured claim against the property;

    c. The Servicer has no enforceable secured or unsecured claim against the Property;

    d. The Mortgage Originator has no enforceable secured or unsecured claim against the property.

Dated:  July 16, 2013

REAL ESTATE LAW CENTER, PC

CHAD T-W PRATT, SR.,
TALA REZAI
Attorneys for Plaintiff

# EXHIBIT A



*FDL Contributor Bill Black scorched everyone with his testimony on the failure of Lehman Brothers before the House Financial Services Committee today.  His prepared remarks can be found here (PDF).*

CHAIRMAN KANJORSKI: And now we'll hear from Mr. William K. Black, Associate Professor of Economics and Law, the University of Missouri, Kansas City School of Law. Mr. Black.

BILL BLACK: Members of the Committee, thank you.

You asked earlier for a stern regulator, you have one now in front of you. And we need to be blunt. You haven't heard much bluntness in hours of testimony.

We stopped a nonprime crisis before it became a crisis in 1991 by supervisory actions.

We did it so effectively that people forgot that it even existed, even though it caused several hundred million dollars of losses — but none to the taxpayer. We did it by preemptive litigation, and by supervision. We broke a raging epidemic of accounting control fraud without new legislation in the period of 1984 through 1986.

Legislation would've been helpful, we sought legislation, but we didn't get it. And we were able to stop that because we didn't simply consider business as usual.

Lehman's failure is a story in large part of fraud. And it is fraud that begins at the absolute latest in 2001, and that is with their subprime and liars' loan operations.

Lehman was the leading purveyor of liars' loans in the world. For most of this decade, studies of liars' loans show incidence of fraud of 90%. Lehmans sold this to the world, with reps and warranties that there were no such frauds. If you want to know why we have a global crisis, in large part is before you. But it hasn't been discussed today, amazingly.

Financial institution leaders are not engaged in risk when they engage in liars' loans — liars' loans will cause a failure. They lose money. The only way to make money is to deceive others by selling bad paper, and that will eventually lead to liability and failure as well.

When people cheat you cannot as a regulator continue business as usual. They go into a different category and you must act completely differently as a regulator. What we've gotten instead are sad excuses.

The SEC: we're told they're only 24 people in their comprehensive program. Who decided how many people there would be in their comprehensive program? Who decided the staffing? The SEC did. To say that we only had 24 people

is not to create an excuse — it's to give an admission of criminal negligence. Except it's not criminal, because you're a federal employee.

In the context of the FDIC, Secretary Geithner testified today that this pushed the financial system to the brink of collapse But Chairman Bernanke testified we sent *two people* to be on site at Lehman. We sent *fifty* credit people to the largest savings and loan in America. It had 30 billion in assets. We had a whole lot less staff than the Fed does.

We forced out the CEO. We replaced the CEO. We did that not through regulation but because of our leverage as creditors. Now I ask you, who had more leverage as creditors in 2008? The Fed, as compared to the Federal Home Loan Bank of San Francisco, 19 years earlier? Incomprehensible greater leverage in the Fed, and it simply was not used.

Let's start with the repos. We have known since the Enron in 2001 that this is a common scam, in which every major bank that was approached by Enron agreed to help them deceive creditors and investors by doing these kind of transactions.

And so what happened? There was a proposal in 2004 to stop it. And the regulatory heads — there was an interagency effort — killed it. They came out with something pathetic in 2006, and stalled its implication until 2007, but it 's meaningless.

We have known for decades that these are frauds. We have known for a decade how to stop them. All of the major regulatory agencies were complicit in that statement, in destroying it. We have a self-fulfilling policy of regulatory failure

because of the leadership in this era.

We have the Fed, the Federal Reserve Bank of New York, finding that this is three card monty. Well what would you do, as a regulator, if you knew that one of the largest enterprises in the world, when the nation is on the brink of economic collapse, is engaged in fraud, three card monty? Would you continue business as usual?

That's what was done. Oh they met a lot — they say "we only had a nuclear stick." Sounds like a pretty good stick to use, if you're on the brink of collapse of the system. But that's not what the Fed has to do. The Fed is a central bank. Central banks for centuries have gotten rid of the heads of financial institutions. The Bank of England does it with a luncheon. The board of directors are invited. They don't say "no." They are sat down.

The head of the Bank of England says "we have lost confidence in the head of your enterprise. We believe Mr. Jones would be an effective replacement. And by 4 o'clock that day, Mr. Jones is running the place. And he has a mandate to clean up all the problems.

Instead, every day that Lehman remained under its leadership, the exposure of the American people to loss grew by hundreds of millions of dollars on average. Aurora was pumping out up to 30 billion dollars a month in liars' loans. Losses on those are running roughly 50% to 85 cents on the dollar. It is critical not to do business as usual, to change.

We've also heard from Secretary Geithner and Chairman Bernanke — we couldn't deal with these lenders because we had no authority over them. The Fed had unique authority since 1994 under HOEPA to regulate all mortgage lenders. It finally used it in 2008.

They could've stopped Aurora. They could've stopped the subprime unit of Lehman that was really a liar's loan place as well as time went by.

(Kanjorski bangs the gavel)

Thank you very much.

☒ 53 Comments
Tags: Bernanke, lehman brothers, William K. Black, testimony, House Financial Services Committee, Geithner

# EXHIBIT B

The New York Times Reprints

This copy is for your personal, noncommercial use only. You can order presentation-ready copies for distribution to your colleagues, clients or customers here or use the "Reprints" tool that appears next to any article. Visit www.nytreprints.com for samples and additional information. Order a reprint of this article now.



October 3, 2010

# Flawed Paperwork Aggravates a Foreclosure Crisis

## By GRETCHEN MORGENSON

As some of the nation's largest lenders have conceded that their foreclosure procedures might have been improperly handled, lawsuits have revealed myriad missteps in crucial documents.

The flawed practices that GMAC Mortgage, JPMorgan Chase and Bank of America have recently begun investigating are so prevalent, lawyers and legal experts say, that additional lenders and loan servicers are likely to halt foreclosure proceedings and may have to reconsider past evictions.

Problems emerging in courts across the nation are varied but all involve documents that must be submitted before foreclosures can proceed legally. Homeowners, lawyers and analysts have been citing such problems for the last few years, but it appears to have reached such intensity recently that banks are beginning to re-examine whether all of the foreclosure papers were prepared properly.

In some cases, documents have been signed by employees who say they have not verified crucial information like amounts owed by borrowers. Other problems involve questionable legal notarization of documents, in which, for example, the notarizations predate the actual preparation of documents — suggesting that signatures were never actually reviewed by a notary.

Other problems occurred when notarizations took place so far from where the documents were signed that it was highly unlikely that the notaries witnessed the signings, as the law requires.

On still other important documents, a single official's name is signed in such radically different ways that some appear to be forgeries. Additional problems have emerged when multiple banks have all argued that they have the right to foreclose on the same property, a result of a murky trail of documentation and ownership.

There is no doubt that the enormous increase in foreclosures in recent years has strained the resources of lenders and their legal representatives, creating challenges that any institution might find overwhelming. According to the Mortgage Bankers Association, the percentage of loans that were delinquent by 90 days or more stood at 9.5 percent in the first quarter of 2010, up from 4 percent in the same period of 2008.

But analysts say that the wave of defaults still does not excuse lenders' failures to meet their legal obligations before trying to remove defaulting borrowers from their homes.

"It reflects the hubris that as long as the money was going through the pipeline, these companies didn't really have to make sure the documents were in order," said Kathleen C. Engel, dean for intellectual life at Suffolk University Law School and an expert in mortgage law. "Suddenly they have a lot at stake, and playing fast and loose is going to be more costly than it was in the past."

Attorneys general in at least six states, including Massachusetts, Iowa, Florida and Illinois, are investigating improper foreclosure practices. Last week, Jennifer Brunner, the secretary of state of Ohio, referred examples of what her office considers possible notary abuse by Chase Home Mortgage to federal prosecutors for investigation.

The implications are not yet clear for borrowers who have been evicted from their homes as a result of improper filings. But legal experts say that courts may impose sanctions on lenders or their representatives or may force banks to pay borrowers' legal costs in these cases.

Judges may dismiss the foreclosures altogether, barring lenders from refiling and awarding the home to the borrower. That would create a loss for the lender or investor holding the note underlying the property. Almost certainly, lawyers say, lawsuits on behalf of borrowers will multiply.

In Florida, problems with foreclosure cases are especially acute. A recent sample of foreclosure cases in the 12th Judicial Circuit of Florida showed that 20 percent of those set for summary judgment involved deficient documents, according to chief judge Lee E. Haworth.

"We have sent repeated notices to law firms saying, 'You are not following the rules, and if you don't clean up your act, we are going to impose sanctions on you,' " Mr. Haworth said in an interview. "They say, 'We'll fix it, we'll fix it, we'll fix it.' But they don't."

As a result, Mr. Haworth said, on Sept. 17, Harry Rapkin, a judge overseeing foreclosures in the district, dismissed 61 foreclosure cases. The plaintiffs can refile but they need to pay new filing fees, Mr. Haworth said.

The byzantine mortgage securitization process that helped inflate the housing bubble allowed home loans to change hands so many times before they were eventually pooled and sold to investors that it is now extremely difficult to track exactly which lenders have claims to a home.

Many lenders or loan servicers that begin the foreclosure process after a borrower defaults do not produce documentation proving that they have the legal right to foreclosure, known as standing.

As a substitute, the banks usually present affidavits attesting to ownership of the note signed by an employee of a legal services firm acting as an agent for the lender or loan servicer. Such affidavits allow foreclosures to proceed, but because they are often dubiously prepared, many questions have arisen about their validity.

Although lawyers for troubled borrowers have contended for years that banks in many cases have not properly documented their rights to foreclose, the issue erupted in mid-September when GMAC said it was halting foreclosure proceedings in 23 states because of problems with its legal practices. The move by GMAC followed testimony by an employee who signed affidavits for the lender; he said that he executed 400 of them each day without reading them or verifying that the information in them was correct.

JPMorgan Chase and Bank of America followed with similar announcements.

But these three large lenders are not the only companies employing people who have failed to verify crucial aspects of a foreclosure case, court documents show.

Last May, Herman John Kennerty, a loan administration manager in the default document group of Wells Fargo Mortgage, testified to lawyers representing a troubled borrower that he typically signed 50 to 150 foreclosure documents a day. In that case, in King County Superior Court in Seattle, he also stated that he did not independently verify the information to which he was attesting.

A spokesman for Wells Fargo said the bank was confident in its foreclosure policies and practices; he also noted that the judge overseeing the case involving Mr. Kennerty had ruled in favor of the bank.

Case3:13-cv-03929-MEJ  Document1-2  Filed08/23/13  Page19 of 42

In other cases, judges are finding that banks' claims of standing in a foreclosure case can conflict with other evidence.

Last Thursday, Paul F. Isaacs, a judge in Bourbon County Circuit Court in Kentucky, reversed a ruling he had made in August giving Bank of New York Mellon the right to foreclose on a couple's home. According to court filings, Mr. Isaacs had relied on the bank's documentation that it said showed it held the note underlying the property in a trust. But after the borrowers supplied evidence indicating that the note may in fact reside in a different trust, the judge reversed himself. The court will revisit the matter soon.

Bank of New York said it was reviewing the ruling and could not comment.

Another problematic case involves a foreclosure action taken by Deutsche Bank against a borrower in the Bronx in New York. The bank says it has the right to foreclose because the mortgage was assigned to it on Oct. 15, 2009.

But according to court filings made by David B. Shaev, a lawyer at Shaev & Fleischman who represents the borrower, the assignment to Deutsche Bank is riddled with problems. First, the company that Deutsche said had assigned it the mortgage, the Sand Canyon Corporation, no longer had any rights to the underlying property when the transfer was supposed to have occurred.

Additional questions have arisen over the signature verifying an assignment of the mortgage. Court documents show that Tywanna Thomas, assistant vice president of American Home Mortgage Servicing, assigned the mortgage from Sand Canyon to Deutsche Bank in October 2009. On assignments of mortgages in other cases, Ms. Thomas's signatures differ so wildly that it appears that three people signed the documents using Ms. Thomas's name.

Given the differences in the signatures, Mr. Shaev filed court papers last July contending that the assignment is a sham, "prepared to create an appearance of a creditor as a real party in interest/standing, when in fact it is likely that the chain of title required in these matters was not performed, lost or both."

Mr. Shaev also asked the judge overseeing the case, Shelley C. Chapman, to order Ms. Thomas to appear to answer questions the lawyer has raised.

John Gallagher, a spokesman for Deutsche Bank, which is trustee for the securitization that holds the note in this case, said companies servicing mortgage loans engaged the law firms that oversee foreclosure proceedings. "Loan servicers are obligated to adhere to all legal

Case3:13-cv-03929-MEJ  Document1-2  Filed08/23/13  Page20 of 42

requirements," he said, "and Deutsche Bank, as trustee, has consistently informed servicers that they are required to execute these actions in a proper and timely manner."

Reached by phone on Saturday, Ms. Thomas declined to comment.

The United States Trustee, a unit of the Justice Department, is also weighing in on dubious court documents filed by lenders. Last January, it supported a request by Silvia Nuer, a borrower in foreclosure in the Bronx, for sanctions against JPMorgan Chase.

In testimony, a lawyer for Chase conceded that a law firm that had previously represented the bank, the Steven J. Baum firm of Buffalo, had filed inaccurate documents as it sought to take over the property from Ms. Nuer.

The Chase lawyer told a judge last January that his predecessors had combed through the chain of title on the property and could not find a proper assignment. The firm found "something didn't happen that needed to be fixed," he explained, and then, according to court documents, it prepared inaccurate documents to fill in the gaps.

The Baum firm did not return calls to comment.

A lawyer for the United States Trustee said that the Nuer case "does not represent an isolated example of misconduct by Chase in the Southern District of New York."

Chase declined to comment.

"The servicers have it in their control to get the right documents and do this properly, but it is so much cheaper to run it through a foreclosure mill," said Linda M. Tirelli, a lawyer in White Plains who represents Ms. Nuer in the case against Chase. "This is not about getting a free house for my client. It's about a level playing field. If I submitted false documents like this to the court, I'd have my license handed to me."

# EXHIBIT C

The New York Times Reprints

This copy is for your personal, noncommercial use only. You can order presentation-ready copies for distribution to your colleagues, clients or customers here or use the "Reprints" tool that appears next to any article. Visit www.nytreprints.com for samples and additional information. Order a reprint of this article now.



October 18, 2010

# Some Sand in the Gears of Securitizing
### By FLOYD NORRIS

Was the great securitization machine that made hundreds of billions of dollars in mortgage loans based on a legal foundation of sand?

That possibility, raised by two law school professors, has begun to scare many jittery investors, causing bank stocks to plummet, although they recovered a little Monday.

If they are correct, the best outcome for lenders would be a prolonged delay in completing foreclosures, raising costs still further and paralyzing an already depressed housing market.

The worst outcome would be a conclusion that errors by financial institutions had decoupled the payment promises made by borrowers from the mortgages they signed. In that case, the mortgages would be invalid. Homes could be sold without paying off lenders. There also could be heavy tax consequences for lenders, both in terms of federal income taxes and in payment of back fees for mortgage registrations to local governments across the country.

The arguments involve MERS, the Mortgage Electronic Registration Systems, which was created to smooth the securitization process and, in the process, to allow lenders to avoid paying registration fees to counties each time the mortgage changed hands.

Several state supreme courts have chipped away at MERS. But none has gone nearly as far as the professors, Christopher L. Peterson of the University of Utah and Adam Levitin of Georgetown, say is possible.

Nonetheless, some investors are growing worried. Bank stocks fell sharply last week, even while most shares were rising. JPMorgan Chase, which is a part owner of MERS, said it had not used the service since 2008. At least one title insurance company has gotten a bank to agree to indemnify it if the securitization process causes problems for titles. Without title insurance, the real estate market would grind to a halt.

And earlier this month a federal judge in Oregon issued an injunction blocking Bank of America from foreclosing on a borrower's home. United States District Court Judge Garr M.

Case3:13-cv-03929-MEJ Document1-2 Filed08/23/13 Page23 of 42

King said that under Oregon law, the borrower was likely to prevail on the argument that the use of MERS had invalidated the mortgage.

Last week the American Securitization Forum, a trade group representing companies involved in the securitization industry, said it believed the securitization process was legal, and that its lawyers were preparing a refutation of arguments to the contrary.

There is no question that MERS has been a success in terms of gaining market share. About 60 percent of mortgages in this country show up in local records as being owned by the service. In fact, none are owned by MERS. It was created to act as an agent for others, whether banks or securitization trusts, which own the actual mortgages.

Mr. Peterson, in a paper with the dry title of "Two Faces: Demystifying the Mortgage Electronic Registration System's Land Title Theory," argues that MERS cannot have it both ways, and that it faces problems if it is deemed to be only one of them.

If it is an agent, he wrote, "it is extremely unclear that it has the right to list itself as a mortgagee," as it does. State real estate laws, he said, "do not have provisions authorizing financial institutions to use the name of a shell company," in large part because "the point of these statutes is to provide a transparent, reliable record of actual — as opposed to nominal — land ownership."

If it is a mortgagee, Mr. Peterson added, it has the right to record mortgages in its own name, as it did. But since it does not own the actual loan, doing that could be seen as violating a long line of precedents that bar separating a mortgage from the underlying note in which the borrower promises to pay. He quotes from an 1879 Supreme Court decision holding that "the assignment of the note carries the mortgage with it, while an assignment of the latter alone is a nullity."

If an assignment of the mortgage alone is a nullity, then the mortgage can no longer be enforced. The borrower would still owe the money, but no foreclosure would be possible and the borrower could sell the home without paying off the mortgage. The lender could sue the borrower, but collecting money from distressed former homeowners might be very difficult in many cases.

It was such an argument that persuaded the judge in Oregon to block a foreclosure being pushed by Bank of America on behalf of a subprime mortgage securitization put together by Goldman Sachs in 2006. That securitization, known as GSAMP Trust 2006-HE5, is a troubled one in which investors have already suffered substantial losses. The senior security

Case3:13-cv-03929-MEJ Document1-2 Filed08/23/13 Page24 of 42

of the trust, which was rated AAA at issuance, has not suffered losses so far. But Moody's now rates it at Caa1, a very low junk bond category.

The problems with MERS began to come to light when "vice presidents" of the firm began to submit affidavits in foreclosures, saying the original note had been lost. In some cases those notes were signed by people who signed thousands of such affidavits, and have now admitted they did not actually review the files, as the affidavits said they had.

Nor were those people really employees of MERS. It turns out that MERS allows financial institutions that are its members to name anyone a vice president or assistant secretary of MERS. It seems a little unlikely that someone who had never been hired or paid by a company could be a vice president.

"Ironically, MERS Inc. — a company that pretends to own 60 percent of the nation's residential mortgages — does not have any of its own employees but still purports to have 'thousands' of assistant secretaries and vice presidents," Mr. Peterson wrote. "This corporate structure leads to inconsistent positions, conflicts of interest and confusion."

In a case in Arkansas, the owner of a second mortgage foreclosed on a home without notifying MERS, which was listed as owning the first mortgage. When MERS sued to overturn the foreclosure, the state supreme court ruled that MERS had no case. It had lost nothing, the court concluded, because it was not the actual beneficiary of the first mortgage.

The MERS Web site asserts that "MERS has been designed to operate within the existing legal framework of all 50 states," adding, "Any loan registered on the MERS System is inoculated against future assignments because MERS remains the nominal mortgagee no matter how many times servicing is traded." The company uses the slogan, "Process Loans, Not Paperwork."

A spokeswoman for MERS, Karmela Lejarde, said Monday that Mr. Peterson was wrong about several things. "Every single court challenge to the standing of MERS in the foreclosure process has been upheld, either in the initial court proceeding or upon appeal, when proper evidence is presented before the court," she said in an e-mail.

Asked about the Arkansas Supreme Court decision, she said "that particular case was not about foreclosures," although it did involve an effort by MERS to overturn a foreclosure. She added that the decision was "in direct contravention to longstanding Arkansas law."

It is possible that the courts in most if not all states will conclude that the details of how MERS functioned, even if not completely in accord with state law, should not prevent foreclosures.

But even if that happens, Mr. Levitin, the Georgetown professor, argues that there might be tax consequences that would further harm investors in mortgage securitizations. That is because the securitizations operate under a special provision of tax law that exempts them from taxation. But that status is predicated on the transfer of mortgages to the securitization when it was created. If that is not the case, that could cause a major tax problem.

In addition, Mr. Peterson argues that local governments might prevail if they sue, claiming that the basic operating structure of MERS involved the filing of false documents. In that case, they might be entitled to collect several mortgage recording fees per mortgage — money that presumably would also come out of the securitization trust.

All of these problems might have been avoided had Wall Street sought legislation in the states to assure that such issues would not be raised. It is not clear why that did not happen. Perhaps the lawyers saw no problem, or perhaps they feared that efforts to change the law would be blocked by county officials wanting to preserve a source of revenue from recording mortgage transactions. In any case, no laws were amended.

Now, Mr. Peterson wrote, the courts may be confronted with a difficult conundrum. "Had the parties to these transactions followed the simple policy of specifying in the documents who owns what, a vast amount of confusing litigation and commercial uncertainty could have been avoided. These anchorless liens now flail in the wind of our commercial tempest," he wrote.

"Courts that come to understand this situation will be in a bitter predicament," he wrote. A ruling against the securitizations would "throw the mortgage market into further turmoil."

But ruling the other way, against the complaining borrowers, would have its own perils, he argued, in part because MERS has made it difficult and in some cases impossible to learn from public records just who owns a mortgage, despite a long tradition that such information must be publicly recorded.

"If the courts write opinions allowing MERS to act as a ubiquitous national proxy mortgagee, they will write into the American common law fundamental legal mischief that will plague generations to come," he wrote.

Case3:13-cv-03929-MEJ Document1-2 Filed08/23/13 Page26 of 42

If some courts do rule against MERS, the legal battle could be a long one. Real estate law is largely a matter of state law, leaving the 50 state supreme courts as the final arbiters.

*Floyd Norris comments further on MERS in his blog at nytimes.com/norris.*

# EXHIBIT D

## The New York Times Reprints

This copy is for your personal, noncommercial use only. You can order presentation-ready copies for distribution to your colleagues, clients or customers here or use the "Reprints" tool that appears next to any article. Visit www.nytreprints.com for samples and additional information. Order a reprint of this article now.



October 13, 2010

# Bankers Ignored Signs of Trouble on Foreclosures

## By ERIC DASH and NELSON D. SCHWARTZ

At JPMorgan Chase & Company, they were derided as "Burger King kids" — walk-in hires who were so inexperienced they barely knew what a mortgage was.

At Citigroup and GMAC, dotting the i's and crossing the t's on home foreclosures was outsourced to frazzled workers who sometimes tossed the paperwork into the garbage.

And at Litton Loan Servicing, an arm of Goldman Sachs, employees processed foreclosure documents so quickly that they barely had time to see what they were signing.

"I don't know the ins and outs of the loan," a Litton employee said in a deposition last year. "I'm not a loan officer."

As the furor grows over lenders' efforts to sidestep legal rules in their zeal to reclaim homes from delinquent borrowers, these and other banks insist that they have been overwhelmed by the housing collapse.

But interviews with bank employees, executives and federal regulators suggest that this mess was years in the making and came as little surprise to industry insiders and government officials. The issue gained new urgency on Wednesday, when all 50 state attorneys general announced that they would investigate foreclosure practices. That news came on the same day that JPMorgan Chase acknowledged that it had not used the nation's largest electronic mortgage tracking system, MERS, in foreclosures, since 2008.

That system has been faulted for losing documents and other sloppy practices.

The root of today's problems goes back to the boom years, when home prices were soaring and banks pursued profit while paying less attention to the business of mortgage servicing, or collecting and processing monthly payments from homeowners.

Banks spent billions of dollars in the good times to build vast mortgage machines that made new loans, bundled them into securities and sold those investments worldwide. Lowly

servicing became an afterthought. Even after the housing bubble began to burst, many of these operations languished with inadequate staffing and outmoded technology, despite warnings from regulators.

When borrowers began to default in droves, banks found themselves in a never-ending game of catch-up, unable to devote enough manpower to modify, or ease the terms of, loans to millions of customers on the verge of losing their homes. Now banks are ill-equipped to deal the foreclosure process.

"We waited and waited and waited for wide-scale loan modifications," said Sheila C. Bair, the chairwoman of the Federal Deposit Insurance Corporation, one of the first government officials to call on the industry to take action. "They never owned up to all the problems leading to the mortgage crisis. They have always downplayed it."

In recent weeks, revelations that mortgage servicers failed to accurately document the seizure and sale of tens of thousands of homes have caused a public uproar and prompted lenders like Bank of America, JPMorgan Chase and GMAC Mortgage to halt foreclosures in many states.

Even before the political outcry, many of the banks shifted employees into their mortgage servicing units and beefed up hiring. Wells Fargo, for instance, has nearly doubled the number of workers in its mortgage modification unit over the last year, to about 17,000, while Citigroup added some 2,000 employees since 2007, bringing the total to 5,000.

"We believe we responded appropriately to staff up to meet the increased volume," said Mark Rodgers, a spokesman for Citigroup.

Some industry executives add that they're committed to helping homeowners but concede they were slow to ramp up. "In hindsight, we were all slow to jump on the issue," said Michael J. Heid, co-president of at Wells Fargo Home Mortgage. "When you think about what it costs to add 10,000 people, that is a substantial investment in time and money along with the computers, training and system changes involved."

Other officials say as foreclosures were beginning to spike as early as 2007, no one could have imagined how rapidly they would reach their current level. About 11.5 percent of borrowers are in default today, up from 5.7 percent from two years earlier.

"The systems were not ever that great to begin with, but you didn't have that much strain on them," said Jim Miller, who previously oversaw the mortgage servicing units for troubled

borrowers at Citigroup, Chase and Capital One. "I don't think anybody anticipated this thing getting as bad as it did."

Almost overnight, what had been a factorylike business that relied on workers with high school educations to process monthly payments needed to come up with a custom-made operation that could solve the problems of individual homeowners. Gregory Hebner, the president of the MOS Group, a California loan modification company that works closely with service companies, likened it to transforming McDonald's into a gourmet eatery. "You are already in chase mode, and you never catch up," he said.

To make matters worse, the banks had few financial incentives to invest in their servicing operations, several former executives said. A mortgage generates an annual fee equal to only about 0.25 percent of the loan's total value, or about $500 a year on a typical $200,000 mortgage. That revenue evaporates once a loan becomes delinquent, while the cost of a foreclosure can easily reach $2,500 and devour the meager profits generated from handling healthy loans.

"Investment in people, training, and technology — all that costs them a lot of money, and they have no incentive to staff up," said Taj Bindra, who oversaw Washington Mutual's large mortgage servicing unit from 2004 to 2006.

And even when banks did begin hiring to deal with the avalanche of defaults, they often turned to workers with minimal qualifications or work experience, employees a former JPMorgan executive characterized as the "Burger King kids." In many cases, the banks outsourced their foreclosure operations to law firms like that of David J. Stern, of Florida, which served clients like Citigroup, GMAC and others. Mr. Stern hired outsourcing firms in Guam and the Philippines to help.

The result was chaos, said Tammie Lou Kapusta, a former employee of Mr. Stern's who was deposed by the Florida attorney general's office last month. "The girls would come out on the floor not knowing what they were doing," she said. "Mortgages would get placed in different files. They would get thrown out. There was just no real organization when it came to the original documents."

Citigroup and GMAC say they are no longer giving any new work to Mr. Stern's firm.

In some cases, even steps that were supposed to ease the situation, like the federal program aimed at helping homeowners modify their mortgages to reduce what they owed, had actually contributed to the mess. Loan servicing companies complain that bureaucratic

requirements are constantly changed by Washington, forcing them to overhaul an already byzantine process that involves nearly 250 steps.

*This article has been revised to reflect the following correction:*

**Correction: October 14, 2010**

*A photo caption with an earlier version of this article referred incorrectly to documents related to foreclosures. They are depositions from robosigners, not lawsuits.*

*This article has been revised to reflect the following correction:*

**Correction: October 14, 2010**

*A previous version of this article referred incorrectly to one bank that had halted foreclosures. They were halted by GMAC Mortgage, which is owned by Ally Financial, not by the online retail operation, Ally Bank.*

FROM :Food SafetyNow          FAX NO. :7078231417          Jul. 19 2013 10:45AM  P2

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## VERIFICATION TO COMPLAINT

I, DORI CIOCIOLO declare I am a Plaintiff in the above-captioned action. I have read and reviewed the foregoing Complaint and know the contents thereof. The same is true of my own personal knowledge, except as to those matters which are therein stated on information and belief, and, as to those matters, I believe them to be true. I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this _19_ day of July, 2013 at ___Sebastopol___, California.

_____
DORI CIOCIOLO

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, state bar number, and address) | FOR COURT USE ONLY |
|---|---|
| TELEPHONE NO.:  FAX NO. (Optional):<br>E-MAIL ADDRESS (Optional):<br>ATTORNEY FOR (Name): | |
| SUPERIOR COURT OF CALIFORNIA, COUNTY OF SONOMA<br>600 ADMINISTRATION DRIVE, ROOM 107-J<br>SANTA ROSA, CALIFORNIA 95403-2878 | |
| PLAINTIFF/PETITIONER: | |
| DEFENDANT/RESPONDENT: | |

| ADR INFORMATION SHEET<br>[Sonoma County Superior Court Rules, Rule 16] | CASE NUMBER: |
|---|---|
| (Check one)  ☐ UNLIMITED CASE  ☐ LIMITED CASE<br>(Amount demanded exceeds $25,000)  (Amount demanded is $25,000 or less) | Date:<br>Time:<br>Location:<br>Assigned Judge: |

## NOTICE TO ALL PARTIES AND THEIR ATTORNEYS

The policy of the Sonoma County Superior Court is:

The formal litigation of legal claims and disputes is expensive and time consuming. The overall results achieved by some or all of the parties are often unsatisfactory. There are many modern alternatives to formal court litigation which are less expensive, less time consuming, and more beneficial to the parties. It is therefore the firm policy and goal of this court to encourage the parties in all civil cases to explore and pursue private dispute resolution alternatives at the earliest possible date. (Local Rule 16.1.)

Although most (96-98%) cases do settle, many settlements come only after a considerable amount of time, money, and resources have been expended. Such expenditures, as well as the adversarial nature of litigation, can be a disincentive to settlement. The Sonoma County Superior Court encourages the use of Alternative Dispute Resolution (ADR) as early as possible after the parties become aware of a dispute.

Most ADR processes are voluntary and are paid for by the parties themselves, but ADR has proved in many cases to be faster, cheaper, and more effective than traditional litigation.

## ADVANTAGES OF ADR

The filing of your complaint or answer may be just the beginning of the costs that you will incur during the course of your lawsuit. Lawsuits can be extremely costly. By utilizing ADR methods early in the course of your case, you may significantly reduce these costs by either resolving the case before expensive discovery and trial proceedings are commenced or by narrowing the scope of your discovery by identifying disputed and undisputed factual and legal issues.

ADR can be a fast, economical, efficient, and effective way to resolve civil cases, and most litigants report satisfaction with the process. ADR procedures can be scheduled at your convenience and can be completed in a fraction of the time required for traditional litigation. The cost of ADR will depend on the procedure and the provider you select, and the cost is typically less than litigation.

Most ADR processes are confidential but can result in enforceable agreements. Many ADR processes will give you an opportunity to test the strengths and weaknesses of your case without adverse impact in the event of a trial. Depending upon the method of ADR you select, it may be the last chance for you to control the outcome of your dispute before you place the decision in the hands of a judge or jury.

## METHODS OF ADR

A. MEDIATION: Mediation is one of the most frequently used methods of ADR because it is informal, quick, convenient and confidential. In this process, the parties select a neutral mediator who facilitates the identification of issues and areas of agreement and assists in finding a resolution or settlement of the dispute. Since mediation requires the agreement of the parties to resolve the matter, control of the proceedings and a determination of the settlement terms remains completely in the parties' hands. The mediator remains neutral and assists the parties in arriving at terms that are mutually agreeable.

| PLAINTIFF/PETITIONER: | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: | |

**B. ARBITRATION:** The parties jointly employ a neutral third party or a panel of neutrals to listen to both sides and render a decision. The parties are free to make the arbitrator's decision binding or non-binding. When non-binding, the arbitrator's decision serves as guide or influence upon the parties to bring them closer to settlement. If it is binding, the decision of the arbitrator will be final and generally avoids any further proceedings in the case. Non-binding judicial arbitration may be ordered in certain cases before trial.

**C. EARLY NEUTRAL EVALUATION:** A neutral evaluator is hired by the parties to give an evaluation of the case to help settle it. You or your attorney will be permitted to prepare a written statement, present critical witnesses or other evidence, argue your case to the evaluator, meet separately and confidentially with the evaluator, and utilize the evaluator to communicate any settlement offers to the opposing party.

**D. PRIVATE SETTLEMENT CONFERENCE:** A voluntary settlement conference is similar to early neutral evaluation in that the parties employ a neutral settlement officer who attempts to persuade the parties to accept a compromise position. It is a form of facilitated negotiation in which the settlement officer may express an opinion about the value of the case, the substantive merits of each party's position, and the probable outcome of the trial.

There are various other methods or combinations of methods of ADR, such as summary jury trial, mini-trial, special master and discovery referee. The court encourages the parties to be creative in selecting the process which has the best chance of resolving the case as quickly, effectively, and inexpensively as possible. You will have a chance to review your ADR options at the time of the Early Mediation and Case Management Conference.

The undersigned party is willing to agree to any of the following forms of ADR at this time (for family law and probate actions only). Your selection will inform the other parties in the case of your current thoughts regarding the use of ADR. If all parties agree on a particular ADR method, you will be asked to file a stipulation on the court's form. The stipulation form (Sonoma County Superior Court form #MISC-101) can be found at the court's web site and is available at the court.)

☐ Mediation                              ☐ Early Neutral Evaluation

☒ Non-binding Private Arbitration        ☒ Binding Private Arbitration

☐ Voluntary Settlement Conference        ☐ Summary Jury Trial

☐ Other _____         ☐ Judicial Arbitration

I / We certify that I / We have read and understood (or have had explained to me / us) the foregoing.

Date: _____

_____
Signature of Party

Date: _____

_____
Signature of Party

Date: _____

_____
Signature of Attorney for Party
☐ Additional signatures are attached

NOTE: This form requires the signatures of the parties and their attorney. All parties must complete, file and serve this form in accordance with Sonoma County Superior Court Rules, Rule 16. See Rule 16.3 for specific filing and service instructions.

CV-2 [Rev. July 1, 2004]                    ADR INFORMATION SHEET                    Page 2 of 2

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, state bar number, and address) | FOR COURT USE ONLY |
|---|---|
| TELEPHONE NO.: FAX NO. (Optional): <br> E-MAIL ADDRESS (Optional): <br> ATTORNEY FOR (Name): | |
| SUPERIOR COURT OF CALIFORNIA, COUNTY OF SONOMA <br> 600 ADMINISTRATION DRIVE, ROOM 107-J <br> SANTA ROSA, CALIFORNIA 95403-2878 | |
| PLAINTIFF/PETITIONER: | |
| DEFENDANT/RESPONDENT: | |
| STIPULATION AND ORDER REFERRING MATTER TO ALTERNATIVE DISPUTE RESOLUTION | CASE NUMBER: |
| (Check one): ☐ UNLIMITED CASE (Amount demanded exceeds $25,000) ☐ LIMITED CASE (Amount demanded is $25,000 or less) | Date: <br> Time: <br> Location: <br> Assigned Judge: |

The parties hereby stipulate to refer the case to the following Alternate Dispute Resolution Process:

☐ Mediation ☐ Non-binding Private Arbitration

☐ Binding Private Arbitration ☐ Private Settlement Conference

☐ Early Neutral Evaluation ☐ Judicial Arbitration

The ADR process will be conducted by: (name of individual) _____

Provider's Address _____

Provider's Telephone _____ Fax _____ E-mail address _____

☐ No agreement

The ADR process will be conducted on (date) _____

☐ No agreement

☐ The parties have reached agreement as to the payment of fees of ADR provider.

☐ The parties have not reached agreement as to the payment of fees of ADR provider.

Type or print name of: ☐ Party without attorney ☐ Attorney for ☐ Plaintiff/Petitioner ☐ Defendant/Respondent/Contestant.

(Date and Sign) Attorney or party without attorney (Sign in blue ink)

Type or print name of: ☐ Party without attorney ☐ Attorney for ☐ Plaintiff/Petitioner ☐ Defendant/Respondent/Contestant.

(Date and Sign) Attorney or party without attorney (Sign in blue ink)

☐ Additional signatures are attached

CV-7 [Rev. June 14, 2004]   STIPULATION AND ORDER REFERRING MATTER TO ADR   SCR, Rules 16, 27

PLAINTIFF/PETITIONER:

DEFENDANT/RESPONDENT:

CASE NUMBER:

## ORDER

**A REVIEW HEARING IS SCHEDULED AS FOLLOWS:**

_____          _____
          Date                              Time

All parties must appear at the Review Hearing.  In the event that the case is settled and a dismissal, a notice of settlement or a judgment is filed at least 3 court days before the scheduled Review Hearing, the Review Hearing will be dropped  and no one should appear. You must check the phone message at _____ or go to http://www.SonomaSuperiorCourt.com/tentative/index.html where the tentative dispositions will be posted the day before you are scheduled to come to court to determine if you must appear.

*THE FIRST ATTORNEY OR PARTY LISTED  MUST FILE PROOF OF SERVICE OF A COPY OF THIS ORDER ON ALL PARTIES.*

_____          _____
          Date                              JUDGE OF THE SUPERIOR COURT

CV-7 [Rev. June 14, 2004]          STIPULATION AND ORDER REFERRING MATTER TO ADR          Page 2 of 2

CM-110

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address)*: | FOR COURT USE ONLY |
|---|---|
| TELEPHONE NO.:    FAX NO. *(Optional)*:<br>E-MAIL ADDRESS *(Optional)*:<br>ATTORNEY FOR *(Name)*: | |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF
STREET ADDRESS:
MAILING ADDRESS:
CITY AND ZIP CODE:
BRANCH NAME:

PLAINTIFF/PETITIONER:

DEFENDANT/RESPONDENT:

| CASE MANAGEMENT STATEMENT | CASE NUMBER: |
|---|---|
| *(Check one):* ☐ UNLIMITED CASE ☐ LIMITED CASE<br>(Amount demanded  (Amount demanded is $25,000<br>exceeds $25,000)  or less) | |

A CASE MANAGEMENT CONFERENCE is scheduled as follows:

Date:              Time:          Dept.:          Div.:          Room:

Address of court *(if different from the address above)*:

☐ Notice of Intent to Appear by Telephone, by *(name)*:

INSTRUCTIONS: All applicable boxes must be checked, and the specified information must be provided.

1. Party or parties *(answer one)*:
   a. ☐ This statement is submitted by party *(name)*:
   b. ☐ This statement is submitted jointly by parties *(names)*:

2. Complaint and cross-complaint *(to be answered by plaintiffs and cross-complainants only)*
   a. The complaint was filed on *(date)*:
   b. ☐ The cross-complaint, if any, was filed on *(date)*:

3. Service *(to be answered by plaintiffs and cross-complainants only)*
   a. ☐ All parties named in the complaint and cross-complaint have been served, or have appeared, or have been dismissed.
   b. ☐ The following parties named in the complaint or cross-complaint
      (1) ☐ have not been served *(specify names and explain why not)*:
      (2) ☐ have been served but have not appeared and have not been dismissed *(specify names)*:
      (3) ☐ have had a default entered against them *(specify names)*:
   c. ☐ The following additional parties may be added *(specify names, nature of involvement in case, and the date by which they may be served)*:

4. Description of case
   a. Type of case in ☐ complaint ☐ cross-complaint *(Describe, including causes of action)*:

Form Adopted for Mandatory Use
Judicial Council of California
CM-110 [Rev. January 1, 2009]
CASE MANAGEMENT STATEMENT
Legal Solutions Plus
Cal. Rules of Court, rules 3.720–3.730

CM-110

| PLAINTIFF/PETITIONER: | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: | |

4. b.  Provide a brief statement of the case, including any damages. *(If personal injury damages are sought, specify the injury and damages claimed, including medical expenses to date [indicate source and amount], estimated future medical expenses, lost earnings to date, and estimated future lost earnings. If equitable relief is sought, describe the nature of the relief.)*

☐ *(If more space is needed, check this box and attach a page designated as Attachment 4b.)*

5.  **Jury or nonjury trial**
The party or parties request ____ a jury trial ____ a nonjury trial.   *(If more than one party, provide the name of each party requesting a jury trial):*

6.  **Trial date**
a. ____  The trial has been set for *(date):*
b. ____  No trial date has been set. This case will be ready for trial within 12 months of the date of the filing of the complaint *(if not, explain):*
c.  Dates on which parties or attorneys will not be available for trial *(specify dates and explain reasons for unavailability):*

7.  **Estimated length of trial**
The party or parties estimate that the trial will take *(check one):*
a. ____  days *(specify number):*
b. ____  hours (short causes) *(specify):*

8.  **Trial representation** *(to be answered for each party)*
The party or parties will be represented at trial ☐ by the attorney or party listed in the caption ☐ by the following:
a.  Attorney:
b.  Firm:
c.  Address:
d.  Telephone number:
e.  Fax number:
f.  E-mail address:
g.  Party represented:
☐  Additional representation is described in Attachment 8.

9.  **Preference**
____  This case is entitled to preference *(specify code section):*

10. **Alternative Dispute Resolution (ADR)**
a.  Counsel ☐ has ☐ has not  provided the ADR information package identified in rule 3.221 to the client and has reviewed ADR options with the client.
b.  ☐  All parties have agreed to a form of ADR. ADR will be completed by *(date):*
c.  ☐  The case has gone to an ADR process *(indicate status):*

CM-110 [Rev. January 1, 2009]

**CASE MANAGEMENT STATEMENT**

Page 2 of 4

CM-110

| PLAINTIFF/PETITIONER: | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: | |

10. d.   The party or parties are willing to participate in *(check all that apply):*

(1) ☐ Mediation

(2) ☐ Nonbinding judicial arbitration under Code of Civil Procedure section 1141.12 (discovery to close 15 days before arbitration under Cal. Rules of Court, rule 3.822)

(3) ☐ Nonbinding judicial arbitration under Code of Civil Procedure 1141.12 (discovery to remain open until 30 days before trial; order required under Cal. Rules of Court, rule 3.822)

(4) ☐ Binding judicial arbitration

(5) ☐ Binding private arbitration

(6) ☐ Neutral case evaluation

(7) ☐ Other *(specify):*

e. ☐ This matter is subject to mandatory judicial arbitration because the amount in controversy does not exceed the statutory limit.

f. ☐ Plaintiff elects to refer this case to judicial arbitration and agrees to limit recovery to the amount specified in Code of Civil Procedure section 1141.11.

g. ☐ This case is exempt from judicial arbitration under rule 3.811 of the California Rules of Court *(specify exemption):*

**11. Settlement conference**

☐ The party or parties are willing to participate in an early settlement conference *(specify when):*

**12. Insurance**

a. ☐ Insurance carrier, if any, for party filing this statement *(name):*

b. Reservation of rights: ☐ Yes   ☐ No

c. ☐ Coverage issues will significantly affect resolution of this case *(explain):*

**13. Jurisdiction**

Indicate any matters that may affect the court's jurisdiction or processing of this case, and describe the status.

☐ Bankruptcy   ☐ Other *(specify):*

Status:

**14. Related cases, consolidation, and coordination**

a. ☐ There are companion, underlying, or related cases.

(1) Name of case:

(2) Name of court:

(3) Case number:

(4) Status:

☐ Additional cases are described in Attachment 14a.

b. ☐ A motion to ☐ consolidate ☐ coordinate   will be filed by *(name party):*

**15. Bifurcation**

☐ The party or parties intend to file a motion for an order bifurcating, severing, or coordinating the following issues or causes of action *(specify moving party, type of motion, and reasons):*

**16. Other motions**

☐ The party or parties expect to file the following motions before trial *(specify moving party, type of motion, and issues):*

**CASE MANAGEMENT STATEMENT**

CM-110

| PLAINTIFF/PETITIONER: | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: | |

17. **Discovery**
    a. ☐ The party or parties have completed all discovery.
    b. ☐ The following discovery will be completed by the date specified *(describe all anticipated discovery)*:

        Party                  Description                                Date

    c. ☐ The following discovery issues are anticipated *(specify)*:

18. **Economic Litigation**
    a. ☐ This is a limited civil case (i.e., the amount demanded is $25,000 or less) and the economic litigation procedures in Code of Civil Procedure sections 90 through 98 will apply to this case.
    b. ☐ This is a limited civil case and a motion to withdraw the case from the economic litigation procedures or for additional discovery will be filed *(if checked, explain specifically why economic litigation procedures relating to discovery or trial should not apply to this case)*:

19. **Other issues**
    ☐ The party or parties request that the following additional matters be considered or determined at the case management conference *(specify)*:

20. **Meet and confer**
    a. ☐ The party or parties have met and conferred with all parties on all subjects required by rule 3.724 of the California Rules of Court *(if not, explain)*:

    b. After meeting and conferring as required by rule 3.724 of the California Rules of Court, the parties agree on the following *(specify)*:

21. Total number of pages attached *(if any)*:

I am completely familiar with this case and will be fully prepared to discuss the status of discovery and ADR, as well as other issues raised by this statement, and will possess the authority to enter into stipulations on these issues at the time of the case management conference, including the written authority of the party where required.

Date:

▶

_____        _____
(TYPE OR PRINT NAME)                    (SIGNATURE OF PARTY OR ATTORNEY)

▶

_____        _____
(TYPE OR PRINT NAME)                    (SIGNATURE OF PARTY OR ATTORNEY)

                                    ☐ Additional signatures are attached.

CM-110 [Rev. January 1, 2008]        **CASE MANAGEMENT STATEMENT**        Page 4 of 4

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name & Address): | | FOR COURT USE ONLY |
|---|---|---|
| Telephone No.: | FAX No.: | |
| ATTORNEY FOR (Name): | Bar No. | |
| SUPERIOR COURT OF CALIFORNIA, COUNTY OF SONOMA<br>600 Administration Drive<br>Santa Rosa, CA 95403<br>Telephone: (707) 521-6500 | | |
| PLAINTIFF(S)/PETITIONER(S): | | |
| DEFENDANT(S)/RESPONDENT(S): | | CASE NUMBER: |

### NOTICE OF SELECTION AS MEDIATOR IN COURT-CONNECTED MEDIATION
(Sonoma County Superior Court Local Rule 16)

Name of Mediator Selected: _____

    **PLEASE TAKE NOTICE** that the above-referenced matter is subject to Sonoma County Superior Court Local Rule 16 (Rules Applicable to Alternative Dispute Resolution (ADR)). The parties have selected you to serve as the mediator in this matter. Sonoma County Superior Court has a voluntary, market rate mediation program. All mediations conducted in cases covered by Local Rule 16 are court-connected mediations and are subject to the provisions of California Rules of Court, Rules 3.850 et seq. It is your obligation to familiarize yourself with Local Rule 16 and California Rules of Court, Rules 3.850 et seq. before the mediation. PLEASE NOTE: you are required to have the parties complete an Attendance Sheet for Court-Program Mediation of Civil Case (Alternative Dispute Resolution) (Judicial Council form ADR-107) in accordance with California Rules of Court Rule 3.860. The form is available at the web site of the California Courts www.courtinfo.ca.gov.

    In order to mediate this case, you must complete the acceptance below and sign it in the space provided. (See CRC 3.851 et. seq.) If you *are not* a member of the Sonoma County Superior Court Panel of Mediators, you must provide the completed Notice *with your original signature* to plaintiff (or to cross-complainant, if the Complaint has been dismissed), for filing and service as required by Local Rule 16.4. If *you are* a member of that Panel, you must file and serve copies as required by Local Rule 16.4, not less then five (5) days before commencement of the mediation.

    If you are mediating a case referred to court-connected mediation, regardless of the date of the mediation, you are required to complete and return a Mediator's Questionnaire (Sonoma County Superior Court Local form CV-38) within five (5) days after completion or other termination of the mediation. The completed questionnaire should be sent to the ADR Program Coordinator at 1450 Guerneville Road, Bldg. G, Santa Rosa, CA 95403, or by fax to (707) 521-6756. The plaintiff should provide the Mediator's Questionnaire to you. The questionnaire is also available on the web site of the Sonoma County Superior Court www.sonomasuperiorcourt.com.

    If you have any questions regarding your selection or service as a mediator in this matter or about the Sonoma County Superior Court ADR Program, please feel free to contact the ADR Program Coordinator at (707) 521-6511 or ADR@sonomacourt.org.

### MEDIATOR'S ACCEPTANCE

I, _____ hereby agree to mediate the above-captioned matter subject to
      (print name)

the conditions stated in this notice.

Dated: _____    _____
                                       (Mediator's Signature)

CV-35[Revised 7/1/08]   **NOTICE OF SELECTION AS MEDIATOR IN COURT-CONNECTED MEDIATION** Page 1 of 1

## Superior Court of California, County of Sonoma

# **NOTICE**

### DISCOVERY FACILITATOR PROGRAM

Effective January 1, 2008, the Sonoma County Superior Court promulgated Sonoma County Local Rule 4.14 which established the new Discovery Facilitator Program. Participation in the Discovery Facilitator Program shall be deemed to satisfy a party's obligation to meet and confer under Sonoma County Local Rule 5.5, and applicable provisions of the Code of Civil Procedure and California Rules of Court. This program has been providing assistance in resolving discovery disputes and reducing the backlog of matters on the law and motion calendars in our various civil law departments. The Discovery Facilitator Program is available to all litigants, whether or not a discovery motion has been filed. All attorneys and parties are encouraged by the Sonoma County Superior Court to participate in the program before a motion is filed. In the event a discovery motion is filed, the Sonoma County Superior Court again encourages all attorneys and parties to utilize the Discovery Facilitator Program in order to help resolve or reduce the issues in dispute.

There is a link to Local Rule 4.14 and the list of discovery facilitator volunteers on the official website of the Sonoma County Superior Court at www.sonomasuperiorcourt.com. On the Sonoma County Superior Court home page, under the "AVAILABLE PROGRAMS & HELP" section, click on »Discovery Facilitator Program. You can then click on either "Local Rule 4.14" to obtain the language of the new local rule, or "List of Facilitators" for a list of the volunteer discovery facilitators and accompanying contact and biographical information.

### VOLUNTARY E-SERVICE

The Sonoma County Superior Court and the Sonoma County Bar Association have joined to bring voluntary e-service to Sonoma County.* The Court has pre-approved a Stipulation to submit for cases in which the attorneys or parties would like to use e-service. A copy is available on the Sonoma County Bar Association's website at www.sonomacountybar.org. Follow the link on the home page under the heading "Voluntary E-Service" to access the Stipulation form. Once the Stipulation is completed and signed and a service provider is selected, the Stipulation can be filed with the Court and participants can begin E-serving.

The advantages to E-service are the following:
- *Increased efficiency*
- *Speed of delivery*
- *Verified proof of delivery*
- *Reduced costs*
- *Searchable online repository*
- *Decreased negative impact to the environment*

*Note: Documents will still have to be filed with the Court in accordance with applicable provisions of the Code of Civil Procedure, California Rules of Court and Local Rules.